[683 NYS2d 113]

In the Matter of the Estate of LAUREL G. ELLIS, Deceased. FLORENCE E. SELL, Appellant; RICHARD L. ELLIS et al., Respondents.

Second Department, December 31, 1998

---

### APPEARANCES OF COUNSEL

*Bertine, Hufnagel, Headley, Zeltner, Drummond & Dohn, L. L. P.,* Scarsdale (*Stephen Hochhauser* and *Frank M. Headley, Jr.,* of counsel), for appellant.

*McCullough, Goldberger & Staudt,* White Plains (*Charles A. Goldberger, Patricia W. Gurahian* and *Charles A. Bradley* of counsel), for Richard L. Ellis, respondent.

*Winston & Winston,* Rye (*Allan Winston* of counsel), for John C. Ellis, Jr., respondent.

### OPINION OF THE COURT

RITTER, J. P.

This appeal concerns a family dispute over the last will and testament of the decedent, Laurel G. Ellis. We are asked to determine whether various actions undertaken by the decedent's sons, Richard L. Ellis and John C. Ellis, Jr. (hereinafter the respondents), in relation to the probate of the will violated the in terrorem clause contained in the ninth paragraph of the will. We find that, based on the intent of the testator, the respondents' actions violated the in terrorem clause and therefore the respondents have forfeited their right to take under the will. Indeed, the in terrorem clause at issue was included in the subject will in response to deteriorating family relations, and was both in anticipation of, and a forceful attempt to prevent, the very type of conduct at issue, i.e., conduct by the respondents that would delay the probate of the will, place the testamentary scheme in jeopardy, and harass the petitioner.

The decedent died in 1994. Under her last will and testament, the petitioner Florence E. Sell, the decedent's daughter, was named executrix and was bequeathed the bulk of the decedent's real property and personal effects, and one half of the residuary estate. The respondents are the decedent's sons

and were each bequeathed one quarter of the residuary estate. The decedent's children were not always treated unequally under the decedent's wills, of which there were several. For example, in a will dated September 22, 1986, the children were to take essentially in equal shares. A change started to occur in the late 1980's, after the decedent's husband died. This period saw a marked deterioration in the relationships between the siblings, and between the decedent and her sons, while the bond between the decedent and her daughter Florence strengthened. These changing relationships were evidenced by, among other things, a letter dated March 1990, sent to the decedent by John C. Ellis, Jr. In the letter, John accused Florence of engaging in an elaborate scheme to isolate the decedent and alienate her from her sons. John demanded that the decedent revoke her then-latest will (which was very favorable to Florence), reinstate a prior will which divided the estate essentially equally among the children, and stop aiding Florence financially unless Florence could prove need. If his demands were met, John promised to keep the matter "within the family". However, if his demands were not met, he threatened to take "IMMEDIATE legal action" to nullify the decedent's then-latest will as a product of fraud and undue influence and obtain the appointment of a conservator for the decedent. He also intended to publicize the matter, an act loathsome to the decedent's sense of privacy. In an undated note in the decedent's handwriting, the decedent wrote that Richard had stated that the decedent's "estate would be in court so long that Florence would never see any of the money". Finally, in a will dated May 25, 1990, the decedent noted that the more favorable treatment of Florence under that will was based on the "loving care and attention" Florence had shown both the decedent and her late husband during his long illness as contrasted with "the less than exemplary behavior of [her] sons". Further, the decedent expressly stated that the will was the product of "long and careful thought" and her "deeply held feelings toward [her] children and [was] not in any way the product of any undue influence" by Florence.

In June 1993 the decedent met with a new lawyer to discuss the drafting of a new will (the subject will). The decedent stated, *inter alia,* that her continuing desire was to leave the bulk of her estate to Florence, but that she feared that her sons would "try to cause trouble for Florence". Accordingly, the subject will included the following in terrorem clause: "If any beneficiary under this will in any manner, directly or indirectly,

contests this will or any of its provisions, any share or interest in my estate given to the contesting beneficiary, or to such beneficiary's issue, under this will is revoked and shall be disposed of by adding such share or interest proportionately to the shares of the residuary beneficiaries who have not so contested this will".

In June 1994 the decedent died and the subject will was offered for probate. Preliminary letters testamentary were issued to Florence in July 1994.

In September 1994 the respondents served a verified answer to the petition for probate. The respondents objected to the decedent's nomination of Florence as executor on the grounds of "dishonesty, improvidence [and] substance abuse". The verified bill of particulars, which ran over 30 pages, set forth the basic allegations that were to be repeated and amplified throughout various proceedings. The respondents set forth detailed factual scenarios indicating a course of conduct by Florence spanning several years wherein she allegedly employed lies, deceit, subterfuge, sabotage, and even acts of a criminal nature to isolate the decedent from persons and places familiar to her, to alienate her affections from the respondents and those she trusted, and which threatened the decedent's health and life. The alleged goal of the scheme, which the respondents asserted was highly successful, was to defraud the decedent out of substantial assets while she was still living and to exert undue influence on her testamentary intent. The bill of particulars was verified by both respondents as being, unless otherwise indicated, based on personal knowledge. Pretrial activity during this period included, *inter alia,* the deposition of the draftsman of the will and the two subscribing witnesses, the service of various notices of deposition and subpoenas on parties and nonparties, and court appearances and conferences.

In December 1994 the respondents were successful in obtaining an order compelling Florence to post a bond, contrary to the provisions of the will. The motion which resulted in that order sought additional disclosure.

In January 1995 objections to probate of the will were served on the petitioner's attorney but were apparently never filed. It was alleged that the decedent lacked mental capacity and that the will was a product of fraud and undue influence by Florence. The bill of particulars served in support of these objections merely incorporated by reference the allegations made in the respondents' November 1994 bill of particulars. Pretrial

activity during this period included, *inter alia,* the initial deposition of Florence, the deposition of each of the respondents, the service of notices of deposition and subpoenas duces tecum on several nonparties, and various court conferences and orders. There were also attempts to settle the matter. However, by letter dated February 10, 1995, counsel for the respondents noted: "Our *clients* are unwilling to withdraw *their* objections at this time" (emphasis added).

In March 1995, after being deposed, the respondents amended their November 1994 bill of particulars to provide that the factual allegations therein were made "upon information and belief", rather than upon personal knowledge as originally averred, despite the fact that various events set forth in the bill of particulars were alleged to have been personally witnessed.

In June 1995 John petitioned for temporary letters of administration in order to bring an action to recover damages for wrongful death and intentional tort against both Florence and the hospital in which the decedent died. John alleged that Florence, "assisted" by the hospital staff, had acted in a manner that "hastened" the decedent's death. Further, although not relevant to the allegations in his petition, John submitted an affidavit wherein he reiterated the allegations of fraud and undue influence by Florence. By decision dated December 13, 1995, the Surrogate determined that John was not entitled to such temporary letters because the proposed tort claims were time barred. As to the "new issues and new charges" concerning fraud and undue influence by Florence raised by John in his affidavit, the Surrogate found that such allegations should be addressed in an accounting proceeding.

On December 19, 1995, just six days after being denied the temporary letters of administration, John commenced an action against Florence and her husband in the Supreme Court, Sullivan County. John simply recast the allegations set forth in, among other pleadings, the respondents' November 1994 bill of particulars to claim that Florence and her husband had deprived him, Richard, and the estate of valuable assets. The complaint also alleged that the subject will was the product of fraud and undue influence by Florence and her husband. By order dated March 12, 1996, the complaint was dismissed by the Supreme Court upon motion by Florence and her husband. The Supreme Court held, *inter alia,* that all of the claims raised by John were "covered" by the proceeding pending in Surrogate's Court, that John lacked standing to enforce claims on

behalf of the decedent's estate, and that the Surrogate, in his decision dated December 13, 1995, had already passed on and dismissed the claims made in the complaint.

In early 1996 the respondents continued their deposition of Florence in the probate proceeding and there were several calendar status conferences. On July 10, 1996, at one such conference, counsel for Florence noted that discovery would soon be completed and that Florence intended to file a motion for summary judgment dismissing the respondents' answer and objections. Soon thereafter, a schedule for the completion of discovery was drafted and the deposition of Florence's husband was noticed. At another conference on July 22, 1996, respective counsel again conferred on the possibility of a settlement. Further, it was noted by the court that the objections to probate could not be found in the court file and there was no indication that the requisite filing fee had been paid. However, upon assurances from counsel for the respondents that the objections had been filed and that inquiries would be made, disclosure continued. The next day, settlement discussions broke down and it was agreed that discovery should be completed. On July 24, 1996, Florence and the respondents were further deposed. In August, while inquiries were still being made concerning the filing of the objections to probate, there was continued contact between the parties and additional disclosure.

By letter dated September 3, 1996, counsel for the respondents informed the court that, although his clients were not interested in entering into a "global settlement", they were not disputing that objections to the will had not been properly filed. Thus, counsel noted, although the respondents had no desire "to proceed with respect to any Will contest", they saw no need to "withdraw" their objections, as they were never filed.

At a conference on September 4, 1996, the objections to the will were withdrawn, but not the answer. On October 22, 1996, Surrogate Emanuelli signed a decree admitting the will to probate. On the court's own initiative, the words "probate not having been contested" were struck, and the words "no objection having been filed" were substituted therefor.

By petition dated February 17, 1997, Florence commenced this proceeding for construction of the in terrorem clause of the subject will. Florence alleged that the extensive pretrial litigation of the will by the respondents violated the clause, thereby resulting in forfeiture of their bequests under the will. In the

order and decree appealed from, the court found, *inter alia,* that the clause had not been violated. We now reverse.

■ As a threshold issue, the respondents argue that all of the proceedings at issue, with the exception of the objections to probate, were either legitimate inquiries under the SCPA to determine the fitness of Florence to serve as executrix (*see,* SCPA 707) and/or to aid the Surrogate in determining whether the proffered will should be admitted to probate (*see,* SCPA 1408), or concerned challenges to actions undertaken by Florence or her husband prior to the decedent's death which did not implicate the will. Thus, the respondents argue, other than the objections to probate, none of the proceedings at issue even implicate the in terrorem clause of the will. Further, they argue, because the objections to probate were never filed and the requisite fee never paid, such objections were a nullity and should not be considered. John also argues that, in any event, he should not suffer from the consequences arising from the objections to probate because he was not a named objectant. These arguments lack merit.

Contrary to the respondents' arguments on appeal, the record does not reveal a series of separate and distinct proceedings based on separate and distinct claims, and seeking separate and distinct disclosure. Rather, the record reveals that neither the respondents nor their counsel maintained any consistent and meaningful distinction between the various proceedings. Nor was there any attempt to adequately identify the respondent in whose name a particular proceeding was brought. The various proceedings were being litigated as, in essence, mere aspects of a single concerted effort by both respondents to attack, either directly or indirectly, the decedent's scheme of testamentary descent and to harass Florence. Thus, for example, although several of the proceedings putatively set forth distinct claims and sought distinct remedies, each ultimately included allegations, however irrelevant or collateral to such claims, of fraud and undue influence by Florence. Proof of such allegations, regardless of the label given the proceeding in which they might be determined, would necessarily affect the decedent's testamentary scheme, the very heart of what is protected by an in terrorem clause. Further, for example, although the record contains both an "answer" and "objections to probate", the respondents concede that, in proceedings before the Surrogate's Court, both pleadings may serve the same purpose (*see,* SCPA 302 [1] [c]; *Matter of Herle,* 173 Misc 879). Here, this is made manifest by the fact that the

allegations made in support of the objections to probate merely incorporated by reference the allegations of the bill of particulars served in support of the answer (see, Matter of Scheu, 29 AD2d 626 [allegations of undue influence and misrepresentation may be sufficient to establish incompetence to serve under SCPA 707]). Indeed, the interrelated nature of the various proceedings is exhibited throughout the record, including the action commenced by John in the Supreme Court, Sullivan County. Although John argued that the action concerned conduct by Florence and her husband which predated the decedent's death and which, therefore, did not implicate the subject will, the action was dismissed on the ground, inter alia, that it was duplicative of the proceedings in Surrogate's Court. In sum, even assuming, arguendo, that aspects of the proceedings other than the objections to probate raised additional issues which did not implicate the in terrorem clause, given the lack of consistent and meaningful separation between the proceedings, and the interrelated nature of the pleadings and claims, neat distinctions as to various pretrial activities and the pleadings and claims to which they allegedly attached cannot and should not be made. Rather, examination of the whole of the pretrial activity is relevant to our inquiry into whether the in terrorem clause at issue was violated.

Further, on the facts presented, it is not determinative that the objections to probate were never properly filed and the requisite fee never paid. Significantly, there is no evidence that any attempt was made to excuse, waive, or cure such law office failure (see, SCPA 1410; 22 NYCRR 207.36; Matter of Brody, 197 AD2d 447; Matter of Arpels, 181 AD2d 423; Matter of Boyce, 158 AD2d 422). Moreover, for example, the respondents might have sought to amend their "answer" to include express allegations of undue influence and fraud, allegations clearly raised by the bill of particulars proffered in support thereof (see, SCPA 102; CPLR 101, 3025). Further given, inter alia, the ongoing settlement negotiations, it cannot be said that the decedent's testamentary scheme was not placed in genuine jeopardy. Thus, it would be highly inequitable to permit the respondents to argue that, having obtained significant pretrial disclosure concerning their allegations, having subjected Florence to considerable harassment, and having delayed probate of the estate for over two years, they should be permitted to benefit from their failure to file the objections (see, Matter of Siegel, 29 AD2d 502, affd 23 NY2d 776).

Equally meritless is John's argument that he should not suffer any of the consequences arising from the objections to

probate because he was not a named objectant. First, such a position on appeal impermissibly contradicts his own sworn assertions before both the Supreme Court and the Surrogate's Court that he was a party to the objections. For example, in his verified complaint in the action in the Supreme Court, Sullivan County, John averred that "[w]ritten objections to the probate of the [subject] Will were filed by the Plaintiff [John] and his brother Richard L. Ellis". In his affidavit in support of his petition for temporary letters testamentary, John averred that both he and Richard had "filed objections to the Will", and in his answer to this proceeding he asserted that he *served* but never *filed* any answer or objections" (emphasis in original). In any event, even in the absence of such express admissions, the respondents, as noted, failed to maintain any consistent and meaningful distinction between the various proceedings and they failed to adequately identify the respondent in whose name a particular proceeding was brought. Indeed, throughout the record, John is repeatedly characterized as an "objectant" and treated as a party to the objections. Thus, at the very least, John was "indirectly" involved in the objections to probate, which would also be prohibited under the in terrorem clause at issue.

In any event, the respondents argue none of the proceedings at issue violated the in terrorem clause because the word "contest" as used in in terrorem clauses has achieved the status of a term of art and is satisfied only by either a trial on the merits or a settlement for consideration (*see, Matter of Cronin,* 143 Misc 559, *affd* 237 App Div 856; *Matter of Stiehler,* 133 Misc 2d 253; *see also,* 39 NY Jur 2d, Decedents' Estates, § 968). Here, they argue, because there was neither a trial on the merits nor a settlement for consideration, they cannot, under any view of the facts, be held to have engaged in a will "contest". However, we need not pass on the accuracy of this proffered interpretation of the case law nor determine whether, if such an interpretation is accurate, such a general rule of construction should be adopted by this Court. Rather, in the in terrorem clause at issue, the modification of the word "contest" by the phrase, "in any manner", is sufficient to remove the clause from the purported general rule of construction.

In terrorem clauses, although not favored and strictly construed, are enforceable (*see, Matter of Stiehler, supra).* The cardinal rule of construction of a will and, concomitantly, of an in terrorem clause, is to carry out the intent of the testator (*see, Matter of Fabbri,* 2 NY2d 236; *Matter of Martin,* 255 NY

248; *Matter of Cook,* 244 NY 63; *Williams v Jones,* 166 NY 522; *Fell v McCready,* 236 App Div 390; *Matter of Stiehler, supra; Matter of Blodgett,* 168 Misc 898; *Matter of Von Deilen,* 154 Misc 877). "The intention must be gathered from all the surrounding circumstances and the writings interpreted according to the purpose which the parties had in mind" (*Matter of Cook, supra,* at 69). However, "the probable intention of the writer, as indicated by extrinsic facts, may not prevail over the plain meaning of the written word, nor have any force whatever, unless the words incorporated in the writing are susceptible of a meaning which expresses the intent thus disclosed" (*Matter of Smith,* 254 NY 283, 289). Thus, although extrinsic evidence may not be admitted to vary, contradict, or add to the terms of a will that is clear and unambiguous, such evidence may be admitted for the purpose of aiding a court in ascertaining the real intent of a testator or testatrix when intent cannot be ascertained with reasonable certainty from the language of the will itself (*see, Matter of Martin, supra; Williams v Jones, supra; Fell v McCready, supra; Matter of Blodgett, supra*). Here, the extrinsic evidence reveals, *inter alia,* a deteriorating relationship between Florence and the respondents, and between the decedent and the respondents, as shown by, among other things, the March 1990 letter from John to the decedent, the affirmation by the draftsman of the will that the decedent expressed fears that her sons would "cause trouble" for Florence, and the decedent's desire to prevent the same. It is clear from this evidence that the decedent's intent in drafting the in terrorem clause was not to limit the conduct which might trigger the clause to only those challenges to the will which resulted in an actual trial or that were settled for consideration, but was rather to prevent the very type of conduct at issue, i.e., conduct that would delay the probate of the will, place the testamentary scheme in jeopardy, and harass Florence. This intent was adequately expressed by the broad language of the clause, which prohibited a beneficiary, "in any manner, directly or indirectly", from contesting the will. Further, such an interpretation of the clause does not vary, or contradict, a clear and unambiguously expressed intent to the contrary.

 ▇ We find no merit to the respondents' argument that the conduct at issue was protected under EPTL 3-3.5 and SCPA 1404 and, therefore, cannot, as a matter of law, be deemed a breach of the in terrorem clause at issue.

In relevant part, EPTL 3-3.5 (b) (3) (D) provides that a "preliminary" examination of persons pursuant to SCPA 1404 will

not constitute a breach of an in terrorem clause as a matter of law. SCPA 1404 (4) provides, *inter alia,* that either before or after the filing of objections to the probate of a will, any party to the proceeding may examine any or all of the attesting witnesses, the person who prepared the will, and, if the will contains an in terrorem clause, the nominated executors and proponents of the will. Here, however, the record does not reveal that the disclosure obtained, including the depositions of the attorney who drafted the will, the attesting witnesses, and Florence, was either noticed or conducted pursuant to SCPA 1404 (4). Rather, the disclosure was apparently sought solely pursuant to CPLR article 31. Finally, disclosure was demanded and received from parties not identified under the statute. In sum, the respondents' argument that the conduct at issue constituted, or was intended to constitute, legitimate preliminary inquiries pursuant to SCPA 1404 (4), rather than plenary discovery proceedings pursuant to CPLR article 31 in a will contest, is one of pure hindsight.

Moreover, this is not an issue of form over substance. Rather, the statutory scheme was enacted to protect limited pre-objection discovery intended to avoid meritless, destructive litigation. Here, not only did discovery occur after the service and claimed filing of objections, but also, the respondents' conduct clearly exceeded that protected by the statutory scheme.

EPTL 3-3.5 was derived from Decedent Estate Law § 126 (L 1946, ch 517). Decedent Estate Law § 126 was enacted in response to in terrorem clauses which purported to prohibit not only the initiation of litigation concerning a will, but also the disclosure of information to the court or any person by a beneficiary that might indicate that the will was not entitled to probate (*see,* Draftman's Note, Exec Comm of Surrogates' Assn. of NY, L 1946, ch 517, n [reprinted in McKinney's Cons Laws of NY, Book 13 (superseded), Decedent Estate Law § 126, Historical Note]). Finding such clauses to be contrary to public policy considerations, Decedent Estate Law § 126 provided that such disclosure would not trigger an in terrorem clause.

In 1966, the Legislature repealed the Decedent Estate Law and replaced it with the current Estates, Powers and Trusts Law. The new enactment substantially revised the content of former Decedent Estate Law § 126 as EPTL 3-3.4 (subsequently renumbered EPTL 3-3.5). In addition to recodifying Decedent Estate Law § 126 (*see,* EPTL 3-3.5 [b] [2], [3] [B], [C]), the Legislature, *inter alia,* adopted the recommendation of the Temporary State Commission on the Modernization, Revision

and Simplification of the Law of Estates (hereinafter the Commission) to codify certain case law as to what actions concerning a will would not trigger an in terrorem clause (*see,* Revisers' Notes § 3-3.4, appendix to L 1966, ch 952, at 2899-2900). The intent of the Legislature was to preserve "the primacy of the testator's intention with respect to the disposition of his estate", that is, the testator's absolute right to disinherit a party (except a spouse) and, therefore, to make a bequest conditional upon compliance with, among other things, an in terrorem clause, while still permitting certain limited inquiries concerning the validity and authenticity of a will consistent with public policy considerations (*see,* Revisers' Notes § 3-3.4, appendix to L 1966, ch 952, at 2899-2900). Among the provisions adopted by the Legislature that were not expressly recommended by the Commission is the provision at issue, EPTL 3-3.5 (b) (3) (D). When initially enacted, the provision permitted the "preliminary examination under SCPA 1404, of a proponent's witnesses in a probate proceeding". In 1992, the provision was amended to permit examination of the person who prepared the will (L 1992, ch 127, § 3). In 1993, it was amended again to include the nominated executors and the proponents of the will (L 1993, ch 514, § 64). The 1993 amendments were explained as follows:

"As the attesting witnesses are very often the staff of the drafting attorney, they usually have very little knowledge of the facts and circumstances surrounding the preparation and drafting of the will, and, in particular facts concerning the capacity of the testator or any undue influence exercised on him. The potential objectant is thereby forced to file objections to a propounded will when there is a suspicion of foul play in order to take advantage of the expanded discovery procedures available once the matter is contested.

"In order to avoid many contested probate proceedings which, once initiated, often create or enhance family differences and emotions, thereby making settlement more difficult, the new bill would allow an interested party to examine, in addition to attesting witnesses and the draftsman of the propounded will, the nominated executors therein and the proponent prior to filing objections but only where the will contains an *in terrorem* clause. This procedure would avoid the need to file objections in many cases where the information gleaned from these additional examinations reveals the lack of any impropriety surrounding the signing of the will, or fails to elicit other information sufficient to warrant the filing of objections. Often, once a

relative or other interested party files objections, the proponent usually takes an immediate adversarial stance, thereby making the settlement of the estate at that stage more difficult. Accordingly, the proposed statute will hopefully not only reduce the number of contested probate proceedings, but will increase the number of pre-contest settlements" (2d Report of EPTL-SCPA Legis Advisory Comm, Draft Mem to Accompany Proposed Amendment to SCPA 1404, 1993 McKinney's Session Laws of NY, at 2364).

The Legislative Advisory Committee further noted:

"Although an *in terrorem clause* serves the valid purpose of preventing needless litigation over the probate of a will, the public policy of ensuring that an instrument is not admitted to probate when it has been procured through fraud or undue influence must take priority over and work in conjunction with the *in terrorem* clause. As stated by Surrogate Radigan, '[T]he respective aims of the in terrorem clause and SCPA 1404, namely the prevention of destructive, fruitless litigation are in complete concert, and require that the requested materials be produced' (*Matter of Emma Veronica Muller,* 138 Misc. 2d 966, 969 [Nass. Co. 1988]). * * *

"An interested party will be better able to evaluate the decision to file objections when at risk of being disinherited pursuant to an *in terrorem* clause. Consequently objections are likely to be filed only in those circumstances in which the evidence obtained from the witnesses strongly indicates problems with the will. * * *

"These revisions [to EPTL 3-3.5] and the parallel revisions to SCPA 1404 will also ease the burden of the court under Section 1408 by permitting an interested party to conduct an inquiry into the facts and circumstances of the execution of the will, thereby ensuring the court's satisfaction 'with the genuineness of the will and the validity of its execution' SCPA 1408 (1)" (2d Report of EPTL-SCPA Legis Advisory Comm, Draft Mem to Accompany Proposed Amendment to EPTL 3-3.5, 1993 McKinney's Session Laws of NY, at 2365-2366).

Thus, although SCPA 1404 (4), by its express terms, permits examinations either before or after the filing of objections, the legislative intent in enacting EPTL 3-3.5 (b) (3) (D) was to immunize only "preliminary" (pre-objection) discovery pursuant to SCPA 1404 (4) of the parties specified in the statute in order to avoid or minimize meritless, destructive litigation. This interpretation of the statute finds support in both the legislative history and from the commentators on the subject (*see,* L 1992,

ch 127 [bill to amend EPTL 3-3.5 entitled "AN ACT to amend the surrogate's court procedure act and the estates, powers and trusts law, in relation to pre-objection discovery procedures"]; Mem of Off of Ct Admin, 1992 McKinney's Session Laws of NY, at 3114 [approving the 1992 amendments to EPTL 3-3.5 (b) (3) (D) as a measure to "clarify and revise certain aspects of pre-objection discovery in matters before a Surrogate's Court"]; 3 Cox-Arenson-Medina, NY Civ Prac: SCPA ¶ 1404.07, at 14-103 [1998] ["[s]uch pre-objection examination (pursuant to SCPA 1404) of attesting witnesses, the person who prepared the will, the nominated executors and the will proponents does not result in a forfeiture of any benefit under the will, despite the presence of an *in terrorem* clause"], at 14-106 ["The limited right under SCPA 1404 to examine attesting witnesses and the person who prepared the will, and, where there is an *in terrorem* clause, the nominated executors and the proponents of the will * * * *before any objections are filed,* must be distinguished from the examination permitted under CPLR Article 31 *after the filing of objections,* in preparation for the trial of those objections" (emphasis in original)]; 2 Rohan, NY Civ Prac: EPTL ¶ 3-3.5 [8] [d] ["EPTL 3-3.5 (b) (3) (D) provides that a beneficiary does not forfeit a benefit under a will by conducting a preliminary examination pursuant to SCPA 1404, prior to the filing of objections to probate, of the will proponents' witnesses (*e.g.,* the attesting witnesses), the person who prepared the will, the nominated executors, or the will proponents themselves, and any in terrorem clause barring such preliminary examination is invalid. A will beneficiary is therefore entitled to go to the brink of commencing a will contest without forfeiting the right to inherit"]).

Here, not only did the respondents seek disclosure from persons other than those specified in SCPA 1404 (4), but also, the further depositions of Florence and others occurred after the objections to probate were served and purportedly filed. Under no view of the facts could it be said that the respondents employed SCPA 1404 (4) to conduct preliminary examinations of the specified parties with the intent of probing the bona fides of any concerns they might have entertained as to fraud and undue influence by Florence in order to avoid meritless, destructive litigation. To the contrary, the factual basis of their claims of fraud and undue influence, which were at least partially formulated prior to the decedent's death, were first proffered in support of their answer in 1994. Further, not only did the respondents not abandon their objections to probate

until long after the draftsman, the attesting witnesses, and Florence (at least initially) were deposed, they do not even allege that any information obtained from such disclosure influenced their decision to abandon the objections. Rather, both parties were preparing for trial when it was discovered that the respondents had not filed their objections. It was this discovery that precipitated the abandonment of the objections. Moreover, despite disclosure lasting over two years, the respondents have not proffered one scintilla of evidence gleaned therefrom which indicates fraud or undue influence by Florence. To the contrary, the competent evidence on the record has actually diminished, to wit: As noted, *supra,* the respondents' factually detailed November 1994 bill of particulars, which was initially verified as being based on personal knowledge, was later amended to provide that the allegations were made on information and belief, despite the fact that certain conduct set forth therein was alleged to have been personally observed. Thus, the only reasonable inference to be drawn from the record is that the respondents neither sought the protections of, nor pursued their claims pursuant to, SCPA 1404 or EPTL 3-3.5 (b) (3) (D), but rather charted a course of litigation from the outset without regard for the consequences, and retreated only when on the brink of failure. We do not purport to adopt a good-faith standard of conduct as to disclosure pursuant to EPTL 3-3.5 and SCPA 1404 (4). Rather, we merely hold that EPTL 3-3.5 (b) (3) (D) may not be employed, with the benefit of hindsight, to convert a plenary and unsuccessful attack upon a will into a preliminary inquiry pursuant to SCPA 1404 (4) merely because the examination of certain parties, had it been conducted prior to the filing of objections, would have been permitted under the statute.

Accordingly, the order and decree is reversed, on the law, the respondents' motions are denied, the petitioner's motion is granted, and the matter is remitted to the Surrogate's Court, Westchester County, for entry of a decree declaring that the respondents have violated the conditions of paragraph nine of the last will and testament of the decedent and therefore their bequests under that will are revoked.

COPERTINO, SANTUCCI and McGINITY, JJ., concur.

Ordered that the order and decree is reversed, on the law, with costs, the respondents' respective motions are denied, the petitioner's motion is granted, and the matter is remitted to the Surrogate's Court, Westchester County, for a judgment

declaring that the respondents have violated the conditions of paragraph nine of the subject will and therefore their bequests under that will are revoked.